**MERCK & CO., INC., Plaintiff,**

v.

**BIOCRAFT LABORATORIES, INC., Defendant.**

**Civ. A. No. 85–5585.**

United States District Court, D. New Jersey.

July 11, 1988.

John J. Francis, Jr., Shanley & Fisher, Morristown, N.J., Joseph M. Fitzpatric, Nicholas M. Cannella, Lawrence Alaburda, Salvatore C. Mitri, Fitzpatrick, Cella, Harper & Scinto, New York City, for plaintiff.

Glenn A. Clark, Riker, Danzig, Scherer, Hyland & Perretti, Newark, N.J., Donald R. Dunner, Robert D. Bajefsky, Carol P. Einaudi, Sylvia Blickstein, Legal Asst., Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C., for defendant.

## OPINION

POLITAN, District Judge.

Plaintiff, Merck & Co., Inc. ("Merck") is a corporation duly organized and existing under the laws of the State of New Jersey. Merck's principal place of business is at 126 Lincoln Avenue, Rahway, New Jersey.

Defendant, Biocraft Laboratories, Inc. ("Biocraft") is a corporation duly organized and existing under the laws of the State of Delaware. Biocraft's principal place of business is at 92 Route 46, Elmwood Park, New Jersey. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1338(a). The parties hereto stipulate that each is subject to personal jurisdiction in the United States District Court for the District of New Jersey. Venue is proper in this district by virtue of 28 U.S.C. § 1400(b).

Since its issuance, Merck has been the owner by assignment of the entire right, title and interest in the following United States Letters Patent: Number: 3,781,430 (hereinafter referred as to "'430"), Issue Date: 12/25/73, Expiration Date: 12/24/90, Applicant: Edward J. Cragoe, Jr., Title: Diuretic Formulations. The validity of this patent is the subject matter of this litigation.

Diuretics are valuable therapeutic agents as they are useful in the treatment of cardiovascular and renal diseases. Their use is indicated in the management of all types and grades of severity of congestive heart failure in which diuretic therapy improvement is required. Due to the resulting loss of water and electrolytes, dramatic improvement is noted in peripheral and pulmonary edema, dyspnea, orthopnea, cough, ascites and pleural effusion. Diuretics also provide effective therapy in various forms of renal edema, *e.g.*, edema associated with nephrosis and certain types of nephritis. Their administration results in prompt excretion of retained fluid and electrolytes with consequent benefit to the patient. The desired electrolyte to be excreted is sodium chloride.

Although diuretics are often life-saving because of the above beneficial therapeutic effects, most of them have the disadvantage of causing the excretion of appreciable amounts of potassium ions. When an excessive loss of potassium ions occurs, a severe muscular weakness and feeling of extreme physical exhaustion results.

Merck's '430 patent describes and claims compositions for oral administration comprising combinations of amiloride hydrochloride and hydrochlorothiazide, and methods for the use of such combinations in the treatment of hypokalemia. For ease of reference, both the free base form of amiloride and its hydrochloride salt form (amiloride hydrochloride) will be referred to simply as amiloride. Amiloride is a so-called potassium-sparing diuretic—*i.e.*, it causes the excretion of unwanted sodium without also causing the excretion of potassium. Hydrochlorothiazide, on the other hand, is a so-called potassium-eliminating diuretic, causing both the desired effect of sodium excretion but the undesired effect of potassium loss. The combination of amiloride and hydrochlorothiazide results in a reduction in the amount of potassium ions that are eliminated, without a reduction in the amount of sodium ions that are eliminated.

Claims 1 and 4 of the '430 patent cover, respectively, compositions for oral administration comprising amiloride and hydrochlorothiazide and a method of treating hypokalemia by oral administration of such compositions, wherein the ratio of amiloride to hydrochlorothiazide ranges from about 1:1 to 1:10 by weight. The remaining claims 2, 3, 5 and 6 are specific to Merck's commercial product, which comprises a combination of 5 mg amiloride and 50 mg hydrochlorothiazide and its method of use in treating hypokalemia:

"2. A composition according to claim 1 wherein amiloride hydrochloride and hydrochlorothiazide are combined at a ratio of 1 to 10 by weight.

3. A composition for oral administration which comprises 5 mg of amiloride hydrochloride and 50 mg of hydrochlorothiazide.

5. A method according to claim 4 wherein amiloride hydrochloride and hydrochlorothiazide are at a ratio of 1:10 by weight.

6. A method according to claim 5 which contains 5 mg of amiloride hydrochloride and 50 mg of hydrochlorothiazide."

In October 1981, the Food and Drug Administration ("FDA") approved the marketing of both amiloride alone and also the

combination of amiloride and hydrochlorothiazide. Since then, Merck has been marketing and selling in the United States and the European market a commercial product under the brand name *Moduretic* which is a combination of amiloride and hydrochlorothiazide covered by the claims of Merck's '430 patent. *Moduretic* contains 5 mg of amiloride and 50 mg of hydrochlorothiazide, which combination is specifically covered by claims 2 and 3, and its use by claims 5 and 6.

■ On October 15, 1985, Biocraft submitted an abbreviated new drug application ("ANDA") under § 505(j) of the Food, Drug and Cosmetic Act (21 U.S.C. § 355(j)), seeking approval from the FDA to market a copy of *Moduretic* under a generic name, but likewise containing 5 mg amiloride and 50 mg hydrochlorothiazide. Pursuant to 35 U.S.C. § 271(e)(2), Biocraft's submission of that ANDA constituted an act of infringement of Merck's '430 patent as a matter of law. Thus, infringement is not an issue in this litigation. The only issues in this case are whether Merck's '430 patent is valid and enforceable.

As part of its ANDA, Biocraft asserted that the '430 patent is invalid. As required by statute, on October 15, 1985 Biocraft provided Merck with a statement of the factual and legal bases upon which Biocraft premised its invalidity assertions. Merck thereafter filed the Complaint commencing this patent infringement suit. Biocraft filed its Answer and Counterclaim on December 16, 1985, asserting that the '430 patent was invalid or unenforceable. Merck filed its Reply to Counterclaim on December 24, 1985.

The FDA approved Biocraft's ANDA for a generic copy of *Moduretic* on or about July 15, 1987. The effective date of the FDA's approval of Biocraft's ANDA was April 17, 1988, subject to this Court's power to modify such effective date in accordance with 35 U.S.C. § 355(j)(4)(B)(iii). In the course of the trial, this Court issued an interlocutory injunction restraining Biocraft from marketing its generic copy of *Moduretic* pending final decision in this case.

As hereinbefore indicated, the '430 patent claimed that the combination of amiloride and hydrochlorothiazide produced results supporting the issuance of a patent. Specifically, the '430 patent contains the following statements:

The invention involves the coadministration of a pyrazinoylguanidine compound with one of the abovementioned potassium eliminating diuretics to thereby result in a reduction in the amount of potassium ions that are eliminated, without a reduction in the amount of sodium ions that are eliminated. In fact, more sodium ions are eliminated than would be forecast from a knowledge of the natriuretic effects of the individual drugs. The co-administration of these drugs therefore results medically in a synergistic therapeutic accomplishment.

Medically, synergism is obtained when two drugs react favorably. With respect to separate administration of a potassium sparing diuretic and a sodium excreting diuretic, neither of the diuretics can be successfully administered over a period of time without causing undesirable effects on the patient. More specifically, when a sodium excreting diuretic is administered over a period of time, the patient excretes the necessary quantity of undesired Na + (sodium) but in addition thereto excretes the desired K + (potassium), thus subjecting the patient to a hypokalemia state. When a potassium sparing diuretic is administered separately over a period of time, the patient achieves the desired K + (potassium) balance but the quantity of undesired Na + (sodium) excretion is not obtained. Therefore, the favorable reaction existing between these classes of diuretics is that the potassium sparing diuretic potentiates the natriuretic effect of sodium excreting diuretics while simultaneously reversing the K + (potassium) excretion to the desired positive level.

Before embarking on the sea of invention, certain basic guideposts applicable to this Court's review of the patent in question must be stated.

■ A patent is entitled to a presumption of validity. 35 U.S.C. § 282; *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.*, 796 F.2d 443, 446 (Fed.Cir. 1986), *cert. denied,* —— U.S. ——, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1358–60 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984), and each individual claim of the patent is presumed valid independent of the validity of the other claims. 35 U.S.C. § 282; *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc., supra,* at 446; *Preemption Devices, Inc. v. Minnesota Mining and Mfg. Co.*, 732 F.2d 903, 907 (Fed.Cir.1984).

When the defense of validity and unenforceability is raised, the defendant bears the burden of proof as to each defense. *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1569–70 (Fed.Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). And that burden requires that the party asserting the invalidity of the patent must do so by clear and convincing evidence. *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc., supra,* at 446; *American Hoist & Derrick Co. v. Sowa & Sons, Inc., supra,* at 1360. Thus, in the case at bar, plaintiff need not demonstrate that the '430 patent is valid; rather, plaintiff is entitled to prevail if this Court concludes that defendant has failed to meet its burdens of proof. *Panduit Corp. v. Dennison Mfg. Co., supra,* at 1569–1570; *Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556, 1557 n. 2 (Fed.Cir.), *cert. denied,* 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986). *Jones v. Hardy*, 727 F.2d 1524, 1529 n. 3 (Fed.Cir.1984); *Environmental Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 699 n. 9 (Fed.Cir. 1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984).

The law is clear that a patent can be obtained only for subject matter which is novel and nonobvious. 35 U.S.C. §§ 101, 102, 103. Obviousness is defined in § 103 in pertinent part as follows:

A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

While obviousness is a question of law, it is based on factual inquiries concerning the scope and content of the prior art, differences between the prior art and the claims at issue, and the level of ordinary skill in the art. Secondary considerations such as commercial success and unexpected results may also be relevant. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966); *Atlas Powder Co. v. E.I. du Pont de Nemours & Co..* 750 F.2d 1569, 1574 (Fed.Cir.1984). Thus, in the case at bar, a detailed review of the prior art is required to determine the validity of the '430 patent.

■ All parties agree that the closest prior art to the '430 patent is Cragoe patent # 3,313,813 (hereinafter referred to as the '813 patent), which deals generally with pyrazinoylguanidine formulations among which amiloride is one of the covered compounds. Since amiloride is one of the disclosed compounds, defendant argues that the '813 patent's disclosure of amiloride, together with certain other statements made within the patent, constitute the teaching of the prior art which subsumes within it, the claims of the '430 patent. In support of its position, defendant cites specific sections of the '813 patent as follows:

The compounds of this invention are useful because they possess diuretic and natriuretic properties. They differ from most of the known, effective diuretic agents, however, in that the compounds of this invention selectively enhance the excretion of sodium ions without causing an increase in excretion of potassium ions. The potassium loss, which is caused by known diuretics, often results in a severe muscular weakness. Since the compounds of this invention are essentially free of this potassium depletion, they have this decided advantage as diuretics. As diuretic agents, they can be used for the treatment of edema, hyper-

tension and other diseases known to be responsive to this therapy.

*It has also been found as another feature of this invention that when co-administered with other diuretic agents known to enhance the elimination of potassium ions along with sodium ions, the novel pyrazinoylguanidines of this invention will reduce the excretion of potassium ions and thus overcome this undesirable property of other diuretic agents. The compounds of this invention, therefore, are useful in combination with other classes of diuretic agents to prevent the loss of potassium which the other diuretics otherwise would cause to be eliminated.* In addition, the compounds of this invention are useful by themselves as diuretic and/or saluretic agents.

\*     \*     \*     \*     \*     \*

## EXAMPLE 207

Dry filled capsule containing 50 mg. of active ingredient

| | Per capsule, mg. |
|---|---|
| (3,5–diamino–6–chloropyrazinoyl)-guanidine hydrochloride | 50 |
| Lactose | 273 |
| Magnesium stearate | 2 |
| Mixed powders | 325 |

Mix the (3,5–diamino–6–chloropyrazinoyl)-guanidine hydrochloride, from Example 89, lactose, and magnesium stearate and reduce to a No. 60 mesh powder. Encapsulate, filling 325 mg. in each No. 2 capsule.

The above formulations can be employed to prepare compressed tablets or capsules of other novel compounds of this invention hereinbefore described.

*It is also contemplated to combine compounds of this invention in unit dosage form with other known diuretic agents, such as, Hydrochlorothiazide,* 4'-methyl-6-chlorospiro-[2H–1, 2, 4-benzothiadiazide-3 (4H)–1' -cyclohexane ]–7–sulfonamine-1,1–dioxide, trichloromethiazide, cyclopenthiazide, acetazolamine, dichlorphgenamide, chlorthalidone, chlor-

merodrin, chlorazinil or spironolactone. One example of such a combination is presented below:

## EXAMPLE 208

Combination dosage form in dry filled capsule

| | Per capsule, mg. |
|---|---|
| (3–amino–5–isopropylamino–6–chloropyrazinoyl)–3,3–dimethylguanidine huydrochloride (from Example 198) | 50 |
| Hydrochlorothiazide | 50 |
| Magnesium stearate | 2 |
| Lactose | 223 |
| Mixed Powders | 325 |

(Emphasis supplied)

\*     \*     \*     \*     \*     \*

Specifically, the defendant urges that since the '813 patent speaks of the co-administration of a pyrazinoylguanidine with other diuretic agents, among which is hydrochlorothiazide, that therefore, what is claimed in the '430 patent is obvious. Defendant further argued that the juxtaposition of the language between Example 207 and 208 highlights [1] the fact that amiloride should be combined with hydrochlorothiazide. The argument is that since Example 207 is a formulation of amiloride, and hydrochlorothiazide is the first diuretic mentioned in the textual statements following that formulation, and since the example 208 formulation contains hydrochlorothiazide (although it does not include amiloride but rather another guanidine) a person of ordinary skill in the art would conclude that the '813 patent teaches that which is claimed in the '430 patent.

It is clear to this Court, and I so find, that while the passages referred to in the '813 patent suggest that it is "obvious to try" combining a pyrazinoylguanidine with another potassium losing diuretic, (one of which is hydrochlorothiazide), it does not teach the unique specific combinations of drugs as outlined in the '430 patent.

It is well settled that "obvious to try" is not the standard for determining obvious-

---

1. Citing *In re Parameswar Sivaramakrishnan,* 673 F.2d 1383 (C.C.P.A.1982), defendant argues that the combination of amiloride and hydro-

chlorothiazide are *"highlighted"* and therefore taught by the 813 patent. This Court disagrees.

ness and does not support a conclusion that an invention would have been obvious within the meaning of 35 U.S.C. § 103. *In re Fine,* 837 F.2d 1071, 1075 (Fed.Cir.1988); *Uniroyal, Inc. v. Rudkin–Wiley Corp.,* 837 F.2d 1044, 1053 (Fed.Cir.1988); *In re Dow Chemical Co.,* 837 F.2d 469, 473 (Fed. Cir.1988); *In re Geiger,* 815 F.2d 686, 688 (Fed.Cir.1987); *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1380 (Fed.Cir.1986); *American Hospital Supply Corp. v. Travenol Laboratories, Inc.,* 745 F.2d 1, 7 (Fed.Cir.1984). As stated in *Application of Tomlinson,* 363 F.2d 928, 931 (C.C.P.A.1966):

> Slight reflection suggests, we think, that there is usually an element of 'obviousness to try' in any research endeavor, that it is not undertaken with complete blindness but rather with some semblance of a chance of success, and that patentability determinations based on that as the test would not only be contrary to statute but result in a marked deterioration of the entire patent system as an incentive to invest in those efforts and attempts which go by the name of "research."

*See also, United States v. Ciba–Geigy Corp.,* 508 F.Supp. 1157, 1167 (D.N.J.1979) ("If this were the standard for obviousness, then the only experiments that would be encouraged by the patent system would be those undertaken blindly and haphazardly.").

■ In reaching this determination, this Court has heard and considered testimony from various expert witnesses produced by both sides and is satisfied that Dr. George de Stevens, the inventor of hydrochlorothiazide, most closely represents the hypothetical person skilled in the art. As to this finding concerning "skilled in the art", the Court has carefully considered all of the factors outlined by Judge Markey in *Environmental Designs v. Union Oil Co. of Cal.,* 713 F.2d 693, 696–697 (Fed.Cir. 1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984):

Factors that may be considered in determining level of ordinary skill in the art include: (1) the education level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active workers in the field. *Orthopedic Equipment Co., Inc. v. All Orthopedic Appliances, Inc.,* 707 F.2d 1376 at 1381–1382 (Fed.Cir.1983). Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case. The important consideration lies in the need to adhere to the statute, *i.e.,* to hold that an invention would or would not have been obvious, as a whole, when it was made, *to a person of "ordinary skill in the art"—not to the judge, or to a layman, or to those skilled in remote arts, or to geniuses in the art at hand.* (Emphasis supplied.)

A person of ordinary skill in the art in the 1965 to 1966 time frame (the date of the '430 invention) would have had either a Ph.D. degree in Chemistry or Pharmacology, or an M.D. degree with concentration in medicinal chemistry and renal physiology.[2] Such a person would have had several years of hands-on work experience in the design and evaluation of novel diuretic agents and would have been part of a research team that monitored the diuretic activities of novel agents from their first chemical synthesis through, if warranted and appropriate, biological testing first in animals and then in man. That person also would have had personal exposure to structure/activity relationships in a class of potential diuretic compounds, and would have had an understanding of the relationship between animal testing and human trials. Based upon his background and experience, I am satisfied that Dr. de Stevens fits this description and, as such, this Court finds his testimony to be persuasive of the issue of obviousness as it related to the '813 patent.

---

**2.** *See e.g., Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, *cert. denied,* —— U.S. ——, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987); *Orthopedic Equipment Co. v. United States,* 702 F.2d 1005 (Fed.Cir.1983).

Defendant asserts that the person "skilled in the art" in this case need not necessarily be a medicinal chemist whose area of expertise is in the preparation, experminentation and testing of new chemical compounds. Rather, defendant argues that it should be a person who uses or tests diuretic agents or has studied the function of the kidney and the modes of action of diuretic agents. Such a person would be a renal physiologist, a pharmacologist, or a physician having a Ph.D. or an M.D., and knowledge of how the kidney functions, the sites and modes of action of diuretics in the kidney and the therapeutic use of these agents. The Court rejects defendant's hypothesis. It oversimplifies the area of expertise necessary to be skilled in the art in this case and, as such, is not persuasive. The methodology for invention in this area is not a helter-skelter combining of "known diuretic agents". Rather, detailed knowledge of chemical compositions and properties and careful scientific experimentation with them to determine their combined effects is required. This is not a system of handicapping possible results, but rather, inductive experimentation and research by persons skilled in chemical compounds. It serves no purpose to generalize that the combination of a potassium sparing diuretic with a potassium losing diuretic will produce foreseeable results. One must analyze, synthesize and experiment chemically, pharmacologically, and biologically in order to discover and invent the appropriate combined compound. In hindsight, it is easy to state anyone *could have* achieved the result and combined the compounds. But this is not the test. "The test is whether the subject matter of the claimed invention would be obvious to one skilled in the art at the time the inventions were made, *not* what would be obvious to a Judge after reading the patents in suit and hearing the testimony." *Panduit Corp. v. Dennison Mfg. Co.*, 774 F.2d 1082 (Fed.Cir.1985), *vacated*, 475 U.S. 809, 106 S.Ct. 1578, 89

L.Ed.2d 817 (1986) (failure to explain basis of holding), *aff'd in part*, 810 F.2d 1561 (Fed.Cir.1987), *cert. denied*, —— U.S. ——, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). This Court, therefore, rejects the testimony of defendant's expert, Dr. Pruess,[3] as being hindsighted and result oriented without regard to viewing the appropriate "skill in the art" as it existed at the time of the invention.

The '813 patent discloses appropriately 120 pyrazinoylguanidine compounds. There is no indication in the patent that amiloride is the preferred compound. Thus, a person skilled in the art, would not be taught by the '813 patent that amiloride and hydrochlorothiazide should be combined to produce the effects as set forth in the '430 patent. The '813 patent does not describe or forecast the effects that the combined drug would have on sodium excretion, potassium excretion and ratio of sodium excretion to potassium excretion. A composition must be assessed for obviousness only after consideration of its chemical structure as well as its pharmaceutical and biological properties. In short, while the '813 patent "suggests" exploration of combinations of potassium sparing guanidine with potassium losing diuretics, such as hydrochlorothiazide, it does not "teach" the combinations claims in the '430 patent.

Nor does it teach the specific ratios of the combinations as outlined in Claims 2, 3, 5 and 6 of the '430 patent. Those claims are sufficiently non-obvious so as to sustain the validity of the patent. Since the '813 patent discloses in excess of 120 pyrazinoylguanidine and 10 possible potassium losing diuretics, there are more than 1200 possible combinations, of which the combination of Amiloride and Hydrochlorothiazide would be one. And there is no indication in the '813 patent as to the preference for amiloride as opposed to any other pyrazinoylguanidine compound, nor hydroclorothiozide as opposed to other diuret-

---

**3.** While Dr. Pruess qualified as a renal physiologist who has extensive experience in the clinical use of diuretics, a review of his qualifications shows that he did not have any experience as a researcher involved in the design of medicinal

compositions, their structural activity, mechanics of uses or the inductive testing of chemical, pharmocological and/or biological hypotheses created within that process.

ics. Nor is there any hint as to the proportions that would be contained in the mixture. Again, while the '813 patent might titillate one's desire to experiment, it clearly does not teach and thereby make obvious the claims as outlined in Claims 2, 3, 5 and 6 of the '430 patent.

■ Defendant also asserts that the prior art regarding spironolactone and triamterene renders the invention described in the '430 patent obvious to one of ordinary skill in the art at the time the invention was made. The evidence shows, and I so find, that amiloride, triamterene and spironolactone have markedly different chemical structures and properties. Because of these differences, one of ordinary skill in the art would have no reasonable basis to expect these compounds to produce similar results, either alone or in combination with hydrochlorothiazide, simply because each was reported to be a potassium-sparing agent.

The chemical structures of amiloride, triamterene and spironolactone are as follows:

Amiloride

Triamterene

Spironolactone

As shown above, the chemical structures of spironolactone and amiloride are radically different. Spironolactone possesses a steroid-like structure and belongs to a class of compounds called spirolactones. Because the structural differences between these compounds (amiloride and spirolactone) are so extensive, one of ordinary skill in the art would have had no basis upon which to expect that these compounds, either alone or in combination with hydrochlorothiazide, would produce similar diuretic effects. In addition to structural differences, one of ordinary skill in the art would have understood that the differences in chemical properties between steroidal and non-steroidal compounds would have further precluded any rational expectation that each compound class would produce similar pharmacological effects.

Triamterene, as shown above, is a two-ring structure and belongs to a class of compounds called pteridines. Its chemical structure is significantly different from both spironolactone and amiloride. In addition to differences in structure, amiloride contains a basis guanidine group which is not present in the triamterene molecule. One of ordinary skill in the art would have readily perceived that amiloride, on the acid-base scale, was a much more basic

compound than triamterene, and further understood that this pronounced difference in basicity could have some effect on lipophilicity and ion transport across cell membranes. Due to such chemical and structural differences, there would have been no basis to expect amiloride and triamterene to achieve similar diuretic effects, either alone or in combination with hydrochlorothiazide.

In summary, while both spironolactone and triamterene when combined with hydrochlorothiazide produce enhanced sodium excretion and a potassium saving result, similar to the results achieved by the '430 patent, they did not teach, nor even suggest to a person skilled in the art, that the results obtained by the combination as outlined in the '430 patent would occur. It is like comparing apples and oranges. While both are fruits, their creation and chemical compositions are entirely different.

■ Lastly, defendants assert that the French Medicament Patent constitutes prior art which makes the '430 patent obvious. The French Medicament Patent 2.259M entitled "New Diuretic Medicaments" was issued on January 6, 1964 to Merck. The French patent, like a previously expired U.S. patent 3,268,406 (hereinafter referred to as '406 patent) discloses certain (3–amino-pyrazinoyl) guanidines that possess natriuretic and potassium-sparing properties. The compounds of this patent likewise differ structurally from amiloride in that they do not possess an amino substituent at the 5–position. The French Medicament patent discloses that, when co-administered with other diuretic agents known to increase the elimination of potassium ions, the guanidines of the French patent will reduce the elimination of potassium ions. These disclosures are basically the same as the disclosures of the expired '406 patent. This patent does not, however, even suggest that amiloride when co-administered with hydrochlorothiazide would produce the unexpected results actually acknowledged in the '430 patent. It is a completely differ-

ent pyrazinoylguanidine and as expressed by the testimony, a change in one group in a molecule and one atom can completely change the properties and actions of the compound. If anything, the citation of the French Medicament Patent shows that the mere mention of a whole series of pyrazinoylguanidine does not answer the question of invention. Rather, depending upon their chemical structure, their reaction alone or in combination with other chemicals can be dramatic. In fact, a small difference in medicinal chemistry can make a huge difference in properties, actions and results.

Accordingly, this Court has concluded, after reviewing all the prior art, that the '430 patent was not obvious under the applicable legal standards.[4]

The second prong to defendants attack on the '430 patent is that the plaintiff has been guilty of inequitable conduct before the patent office and, therefore, should be barred from enforcing the patent in the case at bar. The applicable standard for this Court to assess inequitable conduct is set forth in *N.V. Akzo v. E.I. DuPont de Nemours*, 810 F.2d 1148, 1153 (Fed.Cir. 1987):

> The defense of inequitable conduct requires proof of (1) an act of misrepresentation, (2) which was material, (3) involving information that was known or should have been known to the patentee, and (4) which was committed with the requisite intent. *Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 698, 218 U.S.P.Q. 865, 870 (Fed.Cir. 1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). *See also J.P. Stevens & Co. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 223 U.S.P.Q. 1089 (Fed.Cir.1984), *cert. denied*, [474] U.S. [822], 106 S.Ct. 73, 88 L.Ed.2d 60 (1985).

> The elements of materiality and intent must be determined separately and then weighed together to ascertain whether the patentee engaged in inequitable conduct. The tribunal must then carefully

---

**4.** The Court also notes the uncontroverted evidence of *Moduretic's* commercial success as providing additional support for the finding that

defendant has failed to sustain its burden of proof as to obviousness.

balance the materiality and intent: the less material the proffered or withheld information, the greater the degree of intent that must be proven. In contrast, a lesser degree of intent must be proven when the information has a great degree of materiality. Indeed, gross negligence can be the intended level of intent when the misrepresentation has a high degree of materiality. Simple negligence, however, or an error in judgment is never sufficient for a holding of inequitable conduct. *J.P. Stevens & Co.*, 747 F.2d at 1560, 223 U.S.P.Q. at 1092; *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1363, 220 U.S.P.Q. 763, 777 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). As to this claim, defendants also carry the burden of proof by clear and convincing evidence, with respect to its charges of inequitable conduct. *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed.Cir. 1987); *Environmental Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 698 (Fed.Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984).

■ Defendants basic attack upon the plaintiff in this regard is that the prior art concerning spironolactone, triamterene, and French Medicament Patent were not disclosed to the P.T.O. examiner and, therefore, plaintiff was guilty of inequitable conduct. As heretofore expressed in this opinion, it is this Court's finding that those three items of prior art do not bear any chemical or structural relationship to the invention disclosed by the '430 patent. The mere fact that the results obtained by those formulations are similar to the '430 patent is simplistic and does not answer the basic question of obviousness or materiality. They are chemically and structurally dissimilar. Knowledge of their chemical properties or combined results with hydrochlorothiazide would not, in any way, be material to the claims of the '430 patent and therefore would not have been material to the PTO examiner. Moreover, as indicated in the record, the '813 patent (admitted by all parties to be the closest prior art to the '430 patent) was before the examiner who clearly assessed its possible applicability to the '430 patent application, and held it not to be preclusive prior art. In addition to its lack of materiality, there is absolutely nothing in this record before the Court to state or suggest in any degree that there was an intent to mislead the P.T.O. examiner.

This Court has thoroughly reviewed all of the actions and entire procedural history before the Patent Office and finds no inequitable conduct or intent to mislead or act fraudulently in connection with plaintiff's actions before the Patent Office. I find no inequitable conduct shown or convincing evidence of threshold levels of materiality and wrongful intent. *J.P. Stevens & Co. v. Lex Tex, Ltd.*, 747 F.2d 1553, 1561 (Fed.Cir. 1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985).

Based upon my review and examination of the exhaustive record before me, I am satisfied that defendant has not sustained its burden of proof by clear and convincing evidence that the '430 Patent is invalid and/or that the inventor was guilty of inequitable conduct before the Patent Office. Accordingly, judgment will be entered in favor of the plaintiff and against the defendant on both the Complaint and Counterclaim. Pursuant to 35 U.S.C. § 271, this Court shall also provide in its judgment that the effective date of the FDA approval of defendant Biocraft's ANDA for generic *Moduretic* shall be December 24, 1990, and that Biocraft is enjoined from engaging in the commercial manufacture, use and sale of generic *Moduretic* until December 24, 1990.

The foregoing shall constitute my findings of fact and conclusions of law.